UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____ 10
DATE FILED: 5/23/17

- - - - - - - - - - - - - - - - x
                          :

UNITED STATES OF AMERICA      :   **SEALED**

                          :   **SUPERSEDING INDICTMENT**

      - v. -         :

                          :   S1 17 Cr. 308 (DLC)

DAVID BLASZCZAK,        :
THEODORE HUBER,         :
ROBERT OLAN and         :
CHRISTOPHER WORRALL,     :

                          :

      Defendants.      :

                          :

- - - - - - - - - - - - - - - - x

## COUNT ONE

(Conspiracy to Convert Property of the United States, to Commit
Securities Fraud and to Defraud the United States)

The Grand Jury charges:

### Relevant Entities and Individuals

1.  At all times relevant to this Indictment, Investment Advisor-A was a privately held group of associated fund advisors specializing in healthcare-related investments.  As of 2017, Investment Advisor-A managed multiple hedge funds and other investment vehicles and had more than $7 billion in assets under management.  Investment Advisor-A's primary place of business is New York, New York.

2.  At all times relevant to this Indictment, the Centers for Medicare & Medicaid Services ("CMS"), a component of the United States Department of Health and Human Services ("HHS"),

administered, among other things, Medicare and Medicaid.   The
Center for Medicare ("CM") is the component of CMS that is
responsible for setting Medicare reimbursement rates for
healthcare providers.

3.   At all times relevant to this Indictment, DAVID
BLASZCZAK, the defendant, served as a consultant at a number of
Washington, D.C.-based firms that, in exchange for a fee, provided
"political intelligence," which included analysis of federal
agency decision-making with respect to, among other topics, how
changes in Government-provided insurance coverage and
reimbursement rates would impact publicly-traded healthcare-
related companies.   Prior to joining the private sector, BLASZCZAK
had worked as a Special Assistant and Health Insurance Specialist
at CMS.   Between in or about January 2012 and in or about November
2014, Investment Advisor-A paid more than $263,000 in consulting
fees to the various firms that employed BLASZCZAK.

4.   At all times relevant to this Indictment, CHRISTOPHER
WORRALL, the defendant, was a CMS employee.   WORRALL began working
at CMS in or about 1999.   Since in or about January 2012, WORRALL
worked in the Director's Office for CM as a Special Assistant and
Senior Technical Advisor.   By virtue of his position in the
Director's Office, WORRALL had broad access to CMS's confidential
deliberations about upcoming reimbursement decisions.   WORRALL
served as the project manager for an internal, non-public data-

2

management system called "DataLink/DataLink2 Project." It contained CMS's most up-to-date claims data that CMS used to inform its decision-making. As discussed more fully below, DAVID BLASZCZAK, the defendant, commonly referred to this data-management system at CMS as the "real-time database."

5.    At all times relevant to this Indictment, THEODORE HUBER, the defendant, was a partner and analyst at Investment Advisor-A, where he was a member of the Medical Devices Team (the "Devices Team"). As an analyst, HUBER's job was to analyze investment decisions and recommend potentially profitable trades for Investment Advisor-A.

6.    At all times relevant to this Indictment, ROBERT OLAN, the defendant, was a partner and analyst at Investment Advisor-A, where he was a member of the Devices Team. As an analyst, OLAN's job was to analyze investment decisions and recommend potentially profitable trades for Investment Advisor-A.

7.    At all times relevant to this Indictment, Jordan Fogel, a co-conspirator not named as a defendant herein, was a partner and analyst at Investment Advisor-A. From in or about 2006 through in or about late 2012, Fogel worked with THEODORE HUBER and ROBERT OLAN, the defendants, on the Devices Team. Thereafter, until in or about 2016 when he departed Investment Advisor-A, Fogel worked as an analyst on Investment Advisor-A's Healthcare Services Team (the "Services Team").

8. At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-1") served as Investment Advisor-A's managing partner. CC-1 had primary responsibility for approving all investment decisions and supervising all analysts, including THEODORE HUBER and ROBERT OLAN, the defendants, and Jordan Fogel. CC-1 encouraged his analysts to submit unanimous trading recommendations for his ultimate decision. These recommendations were made in person, over the phone, and through email.

9. At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-2") was a political intelligence consultant retained by Investment Advisor-A.

10. At all times relevant to this Indictment, Lobbyist-1 was an employee of Drug Company-1, a multinational biotechnology company based in California. Among other things, Drug Company-1 developed and sold drugs, including kidney dialysis-related drugs that were affected by CMS's reimbursement decisions. Lobbyist-1 previously worked at CMS, where Lobbyist-1 met DAVID BLASZCZAK, the defendant.

11. At all times relevant to this Indictment, Political Intelligence Consultant-1 was a political intelligence consultant retained by Drug Company-1.

12. At all times relevant to this Indictment:

4

     a.   Accuray, Inc. ("Accuray") was a corporation headquartered in Sunnyvale, California. Accuray's stock traded on the National Association of Securities Dealers Automated Quotations Stock Market ("NASDAQ") and was listed under the ticker symbol "ARAY."

     b.   DaVita Healthcare Partners, Inc. ("DaVita") was a corporation headquartered in Denver, Colorado. DaVita's stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "DVA."

     c.   Elekta AB ("Elekta") was a corporation headquartered in Stockholm, Sweden. Elekta's stock traded on the Stockholm Exchange under the ticker symbol "EKTAB."

     d.   Fresenius Medical Care AG & Co. KGaA ("Fresenius") was a corporation headquartered in Bad Homburg, Germany. Fresenius's stock traded on the Frankfurt Stock Exchange under the ticker symbol "FME." Fresenius's stock traded on the NYSE through the issuance of American Depository Receipts ("ADRs") under the ticker symbol "FMS."

     e.   NxStage Medical, Inc. ("NxStage") was a corporation headquartered in Lawrence, Massachusetts. NxStage's stock traded on the NASDAQ under the ticker symbol "NXTM."

     f.   Varian Medical Systems ("Varian") was a corporation headquartered in Palo Alto, California. Varian's stock traded on the NYSE under the ticker symbol "VAR."

## CMS Rulemaking Process

13.  As noted above, CM is the component of CMS that administers the national payment systems that determine Medicare reimbursement rates.  The national payment systems include the prospective payment systems ("PPSs"), which is a method of reimbursement in which Medicare payment is made based on a predetermined, fixed amount, and fee schedules, which are listings of fees used by Medicare to pay doctors or other medical providers or suppliers.

14.  CMS updates the PPSs and fee schedules every year through the issuance of proposed and final rules.  These rules are published in the Federal Register after they have been approved by, among others, CMS and the Secretary of HHS.  The release of CMS's proposed and final rules can impact the stock prices of companies that offer products and services covered by the PPSs and fee schedules.  For this reason, CMS typically issues its proposed and final rules after markets close.

## Confidentiality Policies and Prohibitions on Insider Trading

15.  At all times relevant to this Indictment, CMS's Employee Nondisclosure Policy prohibited employees from disclosing "nonpublic, confidential, privileged, or proprietary" information "except as authorized by law." The policy defined nonpublic information as "information that an employee gains by reason of Federal employment and that he/she knows or reasonably should know

is not available to the general public." It further made clear that "no information should be provided to the public unless already available to the public, such as through a public web page or another publication." The policy explained that information learned in the course of CMS employment could be "'market sensitive' information, meaning that its disclosure may have stock or bond market implications." It accordingly prohibited CMS employees, including CHRISTOPHER WORRALL, the defendant, from using the information to make investment decisions, to tip other people, or otherwise to "allow the improper use of nonpublic information to further your own private interest or the interests of another person." Furthermore, as an employee of the executive branch of the United States Government, WORRALL was subject to Section 21A(h) of the Exchange Act (added by the STOCK Act), which provides in relevant part that "each executive branch employee ... owes a duty arising from a relationship of trust and confidence to the United States Government and the citizens of the United States with respect to material, nonpublic information derived from such person's position." Title 15, United States Code, Section 78u-1(h).

16. At all times relevant to this Indictment, CHRISTOPHER WORRALL, the defendant, was subject to the "Standards of Ethical Conduct for Employees of the Executive Branch," which is codified at Title 5, Code of Federal Regulations, Section 2635.703. Those

standards state:   "An employee shall not engage in a financial
transaction using nonpublic information, nor allow the improper
use of nonpublic information to further his own private interest
or that of another, whether through advice or recommendation, or
by knowing unauthorized disclosure."

17.   At all times relevant to this Indictment, CMS prohibited
its employees from receiving gifts from prohibited sources.   The
policy defined "gift" to include "any present, gratuity, favor,
entertainment, hospitality, loan, forbearance, or other item
having monetary value."   The policy defined "prohibited source" to
include "any person, company, or organization" that was, among
other things, "[c]onducting business with CMS" or that "[h]as any
interests that might be affected by the performance or non-
performance of [a CMS employee's] official duties."

18.   At all times relevant to this Indictment, and as set
forth in Investment Advisor-A's compliance manual (the "Compliance
Manual"), Investment Advisor-A prohibited its employees from
committing insider trading.   The Compliance Manual made clear that
no employee could "trade, either personally or on behalf of others,
including the Funds [managed by Investment Advisor-A], while in
possession of material non-public information that is subject to
a duty of confidence or communicate such material non-public
information to others in violation of the law."   The Compliance
Manual cautioned that because Investment Advisor-A "conducts

8

extensive fundamental research on the entire healthcare sector in order to develop and implement investment theses[,]" "such research may sometimes result in [Investment Advisor-A] receiving non-public information about the companies it researches."

### The Scheme to Defraud

19.   From at least in or about 2012 through at least in or about 2014, DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, Jordan Fogel and others known and unknown, participated in a scheme to obtain and convert to their own use confidential and material non-public information from CMS insiders concerning, among other things, CMS's internal deliberations regarding coverage and reimbursement decisions.  As HUBER and OLAN knew, these CMS insiders included BLASZCZAK's former colleagues with whom he had close personal relationships, and who were prohibited from disclosing such information to CMS outsiders.

20.   As a part of the scheme, THEODORE HUBER and ROBERT OLAN, the defendants, and Jordan Fogel encouraged DAVID BLASZCZAK, the defendant, to obtain confidential and material non-public information from CMS insiders.  For instance, between in or about March and April 2012, HUBER, OLAN and Fogel emailed with BLASZCZAK about getting confidential information from a CMS contractor (the "CMS Contractor") who was working on a CMS coding initiative that could have affected reimbursement rates for over one hundred medical tests and, in turn, affected the financial prospects of

multiple publicly-traded companies.  On or about March 26, 2012,
Fogel emailed BLASZCZAK to ask whether BLASZCZAK was "likely to
get a read from staffers" about the reimbursement rates before
they were made public.  On or about April 27, 2012, BLASZCZAK wrote
an email to HUBER, OLAN and Fogel to inform them that he had made
contact with the CMS Contractor.  BLASZCZAK said, "The mystery man
. . . responds.  Here's my chance. . . ."  HUBER told BLASZCZAK,
"Just tell him your doing god's work."  Fogel chimed in, "That is
huge dude . . . don't blow it!  You just turned my frown upside
down so let us know if he bites.  [The CMS Contractor] is the man
with the keys to these companies' coffins. . . ."  In a separate
email chain, HUBER, OLAN and Fogel discussed the possibility of
BLASZCZAK's getting inside information from the CMS Contractor.
Fogel said, "So you guys know, getting a useful input from [the
CMS Contractor] would be way bigger than bonanza bananas bazooka
in my book."  OLAN responded, "Agd.  I think odds of DB getting
shut down by [the CMS Contractor] are 103%."  To which Fogel
replied, "I don't know, he's pretty good w/ this stuff. . . . I'll
take the under 103% all day long."  The CMS Contractor ultimately
rejected BLASZCZAK's attempt to obtain inside information.
Nonetheless, according to HUBER's notes from an in-person meeting
at Investor Advisor-A, BLASZCZAK told HUBER and OLAN that he
thought he would "get a look" at the reimbursement rates before
CMS made the information public.

21.  As a further part of the scheme, DAVID BLASZCZAK, the
defendant, obtained confidential and material non-public
information from his close friend and former CMS colleague
CHRISTOPHER WORRALL, the defendant. BLASZCZAK conveyed
information obtained from WORRALL to THEODORE HUBER and ROBERT
OLAN, the defendants, Jordan Fogel and others, who, knowing that
BLASZCZAK had obtained the information improperly from a CMS
insider in breach of a duty, used the information, in whole or in
part, to cause Investment Advisor-A to purchase and sell
securities.  HUBER, OLAN and others caused Investment Advisor-A to
confer a pecuniary benefit upon BLASZCZAK in the form of consulting
fees in exchange, in part, for the confidential and material non-
public information that BLASZCZAK improperly obtained from
WORRALL.

22.  CHRISTOPHER WORRALL, the defendant, knew that DAVID
BLASZCZAK, the defendant, was a political intelligence consultant
whose clients included hedge funds that traded based on BLASZCZAK's
CMS predictions.  Furthermore, WORRALL frequently discussed
private-sector employment and other business opportunities with
BLASZCZAK.  For instance:

a.  In or about September 2011, BLASZCZAK put WORRALL
in contact with Political Intelligence Consultant-1 so that
WORRALL could interview for a private sector job with Political
Intelligence Consultant-1's political intelligence firm.  WORRALL

11

commented to a family member that working for Political Intelligence Consultant-1 could be a "big opportunity" because of Political Intelligence Consultant-1's "political links." WORRALL further noted that "[i]f I ever do want to really get into politics, like run for Congress, these are the types of people I'd need to be around."

b.     On or about August 9, 2014, BLASZCZAK asked WORRALL to become a "part owner" of a new political intelligence firm that BLASZCZAK was starting. BLASZCZAK told WORRALL, "[m]e and the two guys that work for me are on pace for 1.7 million total revenues for 2014. I bet we come close to 2 million by end of year." BLASZCZAK promised that, if WORRALL joined, they would "kill it working together." WORRALL responded, "You're like a drunk whore to me. Hard to resist. Lol. Let's talk."

23.     Throughout the course of the scheme, DAVID BLASZCZAK, the defendant, communicated with THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, and others, in person, over the telephone and via e-mail, among other means.

### July 6, 2012 Proposed Radiation Oncology Rule

24.     On or about July 6, 2012, after the markets closed, CMS announced in a proposed rule that it was planning to cut reimbursable treatment times for two cancer procedures: (a) intensity modulated radiation therapy ("IMRT") from 60 minutes to 30 minutes, and (b) stereotactic body radiotherapy ("SBRT") from

90 minutes to 60 minutes.  The American College of Radiology had gathered data showing lower procedure times for IMRT and SBRT. CMS's deliberations and eventual decision to adopt that data to inform its reimbursement policy were both material and non-public.

25.  On or about May 8, 2012, approximately two months before CMS publicly announced the proposed rule, DAVID BLASZCZAK, the defendant, learned about CMS's planned radiation oncology reimbursement cuts during a meeting with CHRISTOPHER WORRALL, the defendant.

26.  The next day, on or about May 9, 2012 DAVID BLASZCZAK, the defendant, tipped THEODORE HUBER and ROBERT OLAN, the defendants, and Jordan Fogel about CMS's confidential plans to cut radiation oncology reimbursement rates.

27.  During in or about June 2012, DAVID BLASZCZAK, the defendant, continued to tip THEODORE HUBER and ROBERT OLAN, the defendants, and Jordan Fogel with updates about CMS's internal radiation oncology deliberations.  For instance:

a.  On or about June 6, 2012, BLASZCZAK and HUBER had a telephone call.  During the call, BLASZCZAK reiterated his radiation oncology tip and informed HUBER that the preliminary rule was "targeted for June 27[, 2012]" although BLASZCZAK thought "it will come a week or so later."  HUBER reported to others at Investment Advisor-A, including OLAN and Jordan Fogel, that BLASZCZAK was "lying low on this until close to the release given

how charged it is."  BLASZCZAK's timing information was correct. CMS's internal briefing papers stated that June 27, 2012 was the target release date for the proposed rule.  That timing information was material and confidential.

b.    The next day, on or about June 7, 2012, Jordan Fogel (on behalf of the Devices Team) recommended taking a short position in Varian, Accuray and Elekta based on information from BLASZCZAK. Fogel explained in an e-mail to others at Investment Advisor-A, including HUBER and OLAN:  "CMS expects to release ~June 27 but DB thinks it slips by a week for the proposal.  And who knows if he or others write something at some point . . . so if it were tomorrow we'd be quite big for this scare, but since it's not we thought of increasing some now and more in the coming 1-2 wks."  Twelve minutes later, CC-1 approved short trades in the three stocks.

c.    On or about June 11, 2012, BLASZCZAK visited Investment Advisor-A's Manhattan office and met with HUBER and OLAN to discuss, among other things, CMS's planned radiation oncology cuts.  During the meeting, BLASZCZAK reiterated his radiation oncology tip and made clear that it was based on his knowledge of internal CMS deliberations.  According to HUBER's meeting notes, which were posted on the "Matrix," Investment Advisor-A's internal repository of investment-related information, BLASZCZAK said "Staff has proposed this.  there is concern about politics."