UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                  :

UNITED STATES OF AMERICA,         :
                                  :

  v.                              :

                                  :

DAVID BLASZCZAK,           :  Case No. 17 Cr. 357 (LAK)
THEODORE HUBER,            :
ROBERT OLAN and            :
CHRISTOPHER WORRALL,     :
                                  :

Defendants.               :
                                  :

                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT THEODORE HUBER'S PRETRIAL MOTION TO DISMISS THE INDICTMENT

Barry H. Berke
Dani R. James

KRAMER LEVIN NAFTALIS &
    FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10001
Telephone: 212.715.9100

*Counsel for Theodore Huber*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................ 1

I.    THE COUNTS ALLEGING VIOLATIONS OF SECTIONS 10(b), 1343, AND
1348 MUST BE DISMISSED FOR FAILURE TO ALLEGE A CRIME ........................ 7

    A.    The Indictment Does Not Allege Insider Trading Under Section 10(b) ................ 7

    B.    The Indictment Does Not Allege Wire Fraud Under Section 1343 ..................... 14

    C.    The Indictment Does Not Allege Securities Fraud Under Section 1348 ............. 17

II.   THE COUNTS ALLEGING VIOLATIONS OF SECTIONS 641 AND 371
MUST BE DISMISSED UNDER THE VOID FOR VAGUENESS DOCTRINE
AND THE RULE OF LENITY ...................................................................................... 20

    A.    As Applied in this Case Section 641 is Unconstitutionally Vague and Violates the
Rule of Lenity ...................................................................................................... 20

    B.    As Applied in this Case Section 371 is Unconstitutionally Vague and Violates the
Rule of Lenity ...................................................................................................... 29

CONCLUSION .......................................................................................................................... 34

**Cases**

*Chappell v. United States*,
  270 F.2d 274 (9th Cir. 1959) ............................................................. 29

*Chiarella v. United States*,
  445 U.S. 222, 100 S. Ct. 1108 (1980) .................................................. 8

*Cleveland v. United States*,
  531 U.S. 12, 121 S. Ct. 365 (2000) ..................................................... 28

*Dennis v. United States*,
  384 U.S. 855, 86 S. Ct. 1840 (1966) .................................................. 32

*In re Dep't of Investigation of City of New York*,
  856 F.2d 481 (2d Cir. 1988) .............................................................. 24

*Diamond v. Oreamuno*,
  24 N.Y.2d 494 (1969) ....................................................................... 15

*Dirks v. SEC*,
  463 U.S. 646, 103 S. Ct. 3255 (1983) ..................................... 8, 17, 31

*Haas v. Henkel*,
  216 U.S. 462, 30 S. Ct. 249 (1910) .................................................... 30

*Kolender v. Lawson*,
  461 U.S. 352, 103 S. Ct. 1855 (1983) ............................................... 32

*McDonnell v. United States*,
  136 S. Ct. 2355 (2016) ...................................................................... 28

*Salman v. United States*,
  137 S. Ct. 420 (2016) .......................................................................... 9

*SEC v. Payton*,
  97 F. Supp. 3d 558 (S.D.N.Y. 2015) ................................................... 9

*Skilling v. United States*,
  561 U.S. 358, 130 S. Ct. 2896 (2010) ............................................... 28

*Smith v. Goguen*,
  415 U.S. 566, 94 S. Ct. 1242 (1974) .................................................. 32

*Tanner v. United States*,
    483 U.S. 107, 107 S. Ct. 2739 (1987)..................................................................33

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012)............................................................................12

*United States v. Berlin*,
    472 F.2d 1002 (2d Cir. 1973)........................................................................17

*United States v. Carpenter*,
    484 U.S. 19, 108 S. Ct. 316 (1987)........................................................ *passim*

*United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir. 1986)................................................14

*United States* v. *Chestman*,
    947 F.2d 551 (2d Cir. 1991) (*en banc*) ........................................................16

*United States v. Coplan*,
    703 F.3d 46 (2d Cir. 2012)...................................................................29, 32, 33

*United States v. Cunniffe (Stewart)*,
    No. 15 Cr. 287 (LTS) (S.D.N.Y. July 15, 2015), ECF No. 25 ............................13

*United States v. Curtis*,
    506 F.2d 985 (10th Cir. 1974) ......................................................................12

*United States v. Elefant*,
    999 F.2d 674 (2d Cir. 1993)..........................................................................21

*United States v. Fowler*,
    932 F.2d 306 (4th Cir. 1991) ........................................................................24

*United States v. Girard*,
    601 F.2d 69 (2d Cir. 1979)...................................................................21, 25, 29

*United States v. Harriss*,
    347 U.S. 612, 74 S.Ct. 808 (1954)................................................................21

*United States v. Heicklen*,
    858 F. Supp. 2d 256 (S.D.N.Y. 2012)............................................................12

*United States v. Jiau*,
    734 F.3d 147 (2d Cir. 2013)...........................................................................3

*United States v. Jones*,
    677 F. Supp. 238 (S.D.N.Y. 1988) .........................................................21, 23, 24

*United States v. Lambert*,
    446 F. Supp. 890 (D. Conn. 1978)........................................................21, 22, 23, 28

*United States v. Lanier*,
    520 U.S. 259, 117 S. Ct. 1219 (1997) ...................................................................28

*United States v. Martoma*,
    No. 14-3599, 2017 WL 3611518 (2d Cir. Aug. 23, 2017) ........................................9

*United States v. McAusland*,
    979 F.2d 970 (4th Cir. 1992) ...................................................................25, 26

*United States v. Melvin*,
    No. 3:14-Cr-00022-TCB-RGV, 2015 WL 7116737 (N.D. Ga. May 27, 2015)
    *report and recommendation adopted*,
    143 F. Supp. 3d 1354 (N.D. Ga. Nov. 10, 2015) ...........................................19, 20

*United States v. Mollica*,
    849 F.2d 723 (2d Cir. 1988)...................................................................32

*United States v. Morrison*,
    686 F.3d 94 (2d Cir. 2012)...................................................................22, 27

*United States v. Newman*,
    773 F.3d 438 (2d Cir. 2014)............................................................. *passim*

*United States v. O'Hagan*,
    521 U.S. 642, 117 S. Ct. 2199 (1997)................................. 8 & n.4, 15, 16

*United States v. Peltz*,
    433 F.2d 48 (2d Cir. 1970)...................................................................30

*United States v. Pirro*,
    212 F.3d 86 (2d Cir. 2000)...................................................................12, 17

*United States v. Ragosta*,
    970 F.2d 1085 (2d Cir. 1992)...................................................................16

*United States v. Rengan Rajaratnam*, 13 Cr. 211 (NRB), 2014 WL 1554078
    (S.D.N.Y. Apr. 17, 2014) ...................................................................12

*United States v. Reed*,
    601 F. Supp. 685 (S.D.N.Y. 1985) ...................................................................16

*United States v. Santoro*,
    647 F. Supp. 153 (E.D.N.Y. 1986) ...................................................................12 n.6

*United States v. Santos*,
    553 U.S. 507, 128 S.Ct. 2020 (2008)...................................................................28

*United States v. Slawson*,
   No. 1:14 CR-00186-RWS-JFK, 2014 WL 5804191 (N.D. Ga. Nov. 7, 2014),
   *report and recommendation adopted*
   2014 WL 6990307 (N.D. Ga. Dec. 10, 2014).........................................................19

*United States v. Tana*,
   618 F. Supp. 1393 (S.D.N.Y. 1985)......................................................................27

*United States v. Whitman*,
   115 F. Supp. 3d 439 (S.D.N.Y. 2015)...................................................................12

*United States v. Yates*,
   135 S. Ct. 1074 (2015).........................................................................................28

**Statutes and Rules**

18 U.S.C. § 371................................................................................................... *passim*

18 U.S.C. § 641................................................................................................... *passim*

18 U.S.C. § 1343................................................................................................. *passim*

18 U.S.C. § 1348................................................................................................. *passim*

STOCK Act, 15 U.S.C. § 78u-1(h)................................................................................22

5 C.F.R. § 2635.703.......................................................................................................22

17 C.F.R. § 240.10b-5....................................................................................................18

**Other Authorities**

The Corporate and Criminal Fraud Accountability Act of 2002,
   S. Rep. 107-146, 2002 WL 863249 (May 6, 2002) ........................................18, 19

Tom Hanusik, *Sarbanes-Oxley: Broader Statutes – Bigger Penalties* (May 2003),
   *available at*
   https://www.justice.gov/sites/default/files/usao/legacy/2006/02/14/usab5103.p
   df...................................................................................................................19

## PRELIMINARY STATEMENT

Defendant Theodore Huber respectfully submits this memorandum of law in support of his motion to dismiss the Indictment.

*****

Despite the Second Circuit's rebuke of "the doctrinal novelty" of the government's recent insider trading prosecutions, "which are increasingly targeted at remote tippees," the government is at it once again. *United States v. Newman*, 773 F.3d 438, 448 (2d Cir. 2014). While *Newman* squarely rejected the government's attempt to impose liability on remote tippees based on the claim that, "as sophisticated traders, they must have known that information was disclosed by insiders in breach of a fiduciary duty, and not for any legitimate purpose," *id.* at 443-44 (knowledge of a benefit to the tipper is an essential element in prosecuting a downstream tippee), that is precisely what the government seeks to do in this case. What makes the government's attempt to impose liability in the absence of criminal intent all the more brazen here is the type and source of the purportedly confidential information at issue. Mr. Huber is not charged with trading on information about corporate earnings, takeovers, restructurings or the like, the quintessential type of "inside information" at the heart of most insider trading prosecutions. Rather, he is charged with trading on purportedly confidential government information. But the government agency at issue here is not one that is inherently secretive, like law enforcement or national security-related agencies, which routinely deal with confidential or classified information, the disclosure of which is governed by a highly detailed statutory scheme. Instead, this case involves information purportedly disclosed by insiders at the Centers for Medicare & Medicaid Services ("CMS"), an agency that, far from conducting deliberations about coverage and reimbursement decisions in secret, routinely engages

stakeholders of all kinds, including patients, doctors, healthcare and medical device companies, lobbyists and investors. Indeed, as Marilyn Tavenner, then the Acting Administrator for CMS, confirmed in a January 11, 2012 letter to United States Senator Charles Grassley that was produced to the defense by the government in this case:

> CMS takes seriously its obligation to answer requests for information from beneficiaries, providers, suppliers, other affected stakeholders, Members of Congress and the public about the programs the Agency administers and actions the Agency is proposing to take or implement. We seek to do so in as transparent and open a manner as possible. . . .
>
> CMS [ ] permit[s] employees to brief non-governmental individuals or entities on a case-by-case basis, as determined by the employee's supervisor and in concert with their official responsibilities.

Letter from Marilyn Tavenner to Senator Charles Grassley (Jan. 11, 2012) ("Tavenner Letter") (Declaration of Dani R. James ("James Decl.") Ex. B) at 1, 5. Consistent with that express desire for transparency, CMS holds hundreds of meetings each year with individuals, including people employed by hedge funds and consulting firms, regarding CMS policies and programs. (*Id.* at 3).

Against this backdrop, the government's claim that Mr. Huber traded on confidential information he knew Mr. Blaszczak obtained from CMS does not support the charges against him. Unlike traders receiving information about corporate profits or pending criminal or regulatory investigations, traders receiving information about CMS's plans for reimbursement cannot be said to be on notice that the information was released without proper authorization, let alone that it was disclosed in breach of a duty and in exchange for personal benefit. Given the agency's commitment to transparency, its routine engagement with stakeholders and its disclosure of information on "a case-by-case basis," *id.* at 5, Mr. Huber had

every reason to believe that when a CMS employee spoke with David Blaszczak about reimbursement or coverage issues, he or she was authorized to do so, or did so for some legitimate purpose. The Indictment does not allege otherwise. Nowhere in the 56-page charging document does the government allege that Mr. Huber had knowledge of a breach by and a benefit to a CMS insider. In fact, the Indictment does not even allege that Mr. Huber knew the source of the CMS information. In the absence of these critical allegations, the counts alleging violations of the securities laws must be dismissed.

The counts alleging violations of 18 U.S.C. §§ 1348 and 1343 are similarly deficient. Although enacted in 2002, as far as we are aware, Section 1348 was not used to prosecute insider trading in this District – not even once – before *Newman* was decided.[1] We likewise have been unable to identify a single case in the decade prior to *Newman* in which Section 1343 was used to prosecute a downstream tippee.[2] Like Section 10(b) of the Securities and Exchange Act, Sections 1348 and 1343 are specific intent crimes. And to satisfy the *mens rea* requirements under these statutes, the government must plead and prove knowledge of benefit, just as they must under the securities laws. Because the government has failed to do so, the counts alleging violations of these statutes must be dismissed as well.

In a last ditch effort to impose liability for trading conduct that is not prohibited by the securities laws or Sections 1348 and 1343, the government seizes on the fact that the

---

[1] This is one of three cases in this District that we are aware of in which the government is prosecuting insider trading under Section 1348. The others are *United States v. Yan*, No. 1:17-cr-00497 (KBF) (Indictment filed Aug. 10, 2017) and *United States v. Castro Roca*, No. 16-cr-00585 (LAK) (Indictment filed Aug. 31, 2016).

[2] While the government charged violations of Section 1343 in *United States v. Jiau*, 734 F.3d 147 (2d Cir. 2013), the defendant in that case was the direct tippee who had "promised the tippers insider information for their own private trading." *Id.* at 150.

purportedly confidential information was from CMS and claims that Mr. Huber violated 18 U.S.C. §§ 641 and 371 by trading on it.  But in pursuing these charges against Mr. Huber – a downstream tippee who indirectly received information from an unknown source at an agency that routinely engages with the public – the government pushes the doctrinal envelope past constitutional bounds.  Nothing in the STOCK Act or the Standards of Ethical Conduct for Employees of the Executive Branch, the provisions relied on by the government in the Indictment, provided Mr. Huber with adequate notice that the CMS information he allegedly received was illegally obtained, particularly in light of the agency's acknowledged  practice of answering information requests "in as transparent and open a manner as possible."  Tavenner Letter (James Decl. Ex. B) at 1.  Nor does the Indictment allege that Mr. Huber engaged in or was aware of any deceitful or dishonest conduct used to get the information.  Under these circumstances, the application of Sections 641 and 371 to his alleged conduct is void for vagueness and violates the rule of lenity.

While the Indictment is artfully drafted to obscure these fundamental deficiencies, we respectfully submit that because the facts alleged do not state an offense as a matter of law, the Indictment against Mr. Huber must be dismissed.

## BACKGROUND

On May 24, 2017, the government filed an eighteen-count Indictment against Mr. Huber and Robert Olan, analysts at Deerfield Capital, along with co-defendants David Blaszczak, a Washington, D.C.-based consultant, and Christopher Worrall, a CMS employee. According to the Indictment, Mr. Worrall provided confidential CMS information to Mr. Blaszczak relating to CMS's proposed cuts to the reimbursement rates for radiation oncology and kidney dialysis.  Mr. Blaszczak in turn allegedly passed that information along to Messrs. Huber and Olan and others at Deerfield, which executed trades in securities based on the

information that Mr. Blaszczak had provided. While Count One charges the defendants with conspiracy to convert property of the United States, to commit securities fraud, and to defraud the United States, in violation of 18 U.S.C. § 371, Count Two charges them with conspiracy to commit wire and securities fraud, in violation of 18 U.S.C. § 1349.

Turning to the substantive counts, the Indictment (James Decl. Ex. A) charges the defendants with a variety of crimes relating to the disclosure of purportedly confidential information about cuts in reimbursement for radiation oncology and the allegedly related trading by Deerfield. Count Three charges the defendants with conversion of property of the United States under 18 U.S.C. §§ 641 and 2. Counts Four through Eight charge them with insider trading in violation of Sections 10(b) and 32 of the Securities Exchange Act of 1934, Securities and Exchange Commission Rule 10b-5 (collectively referred to as "Section 10(b)"), and 18 U.S.C. § 2. Count Nine charges the defendants with wire fraud pursuant to 18 U.S.C. §§ 1343 and 2, and Count Ten charges them with securities fraud under 18 U.S.C. §§ 1348 and 2.

The Indictment also alleges substantive counts – Counts Eleven through Sixteen – against Messrs. Blaszczak and Worrall relating to Deerfield's alleged trading on confidential information relating to reimbursement for kidney dialysis. Mr. Huber is not charged in any of these counts. The remaining counts – Seventeen and Eighteen – charge Mr. Blaszczak alone with conspiracy and conversion relating to his purported disclosure of CMS confidential information relating to a June 2013 home health regulatory action to an unrelated hedge fund.

Despite its length, critical allegations are conspicuously missing from the Indictment. For example, while the Indictment alleges Mr. Huber traded on information he knew Mr. Blaszczak had obtained "improperly from a CMS insider in breach of a duty" (Indictment ¶ 21), the Indictment does not allege that Mr. Huber knew that the CMS insider who disclosed

the purportedly confidential information did so for a personal benefit. The Indictment similarly alleges that Mr. Huber knew that Mr. Blaszczak received information from CMS insiders, *some* of whom were Mr. Blaszczak's "former colleagues with whom he had close personal relationships" (*id.* ¶ 19), but it does not allege that Mr. Huber knew the information Mr. Blaszczak provided about the proposed changes in reimbursement for radiation oncology or kidney dialysis came from one of those former colleagues. Indeed, in the very paragraph following the allegation about *some* of Mr. Blaszczak's sources, the Indictment alleges that Mr. Huber encouraged Mr. Blaszczak to try to obtain confidential information from a CMS Contractor whom Mr. Blaszczak did not know at all (and in fact referred to as "the mystery man"), and to whom Mr. Blaszczak offered nothing. (*Id.* ¶ 20).

And while the Indictment alleges that Mr. Blaszczak and Mr. Worrall were close friends (*id.* ¶ 21), and that the two men "frequently discussed private-sector employment and other business opportunities" (*id.* ¶ 22), it does not allege that Mr. Huber knew that Mr. Worrall was the source of any information that Mr. Blaszczak provided to Deerfield, let alone that he knew anything about the relationship between the two men. The Indictment also alleges that, following a May 8, 2012 meeting with Mr. Worrall, Mr. Blaszczak "continued to tip" Mr. Huber, with unspecified "updates" from unnamed sources. *See id.* ¶¶ 25, 27, 32. And in the section alleging conversion of government property, the Indictment contends that Mr. Huber received confidential information from Worrall "and others" about the proposed radiation oncology rule. (*Id.* ¶ 77). But regardless of whether Mr. Worrall was the exclusive source of Mr. Blaszczak's information relating to the radiation oncology and kidney dialysis rules, there is nothing in the

Indictment alleging that Mr. Huber was aware of any benefits flowing to Mr. Worrall or anyone else, or even the circumstances under which the information was shared with Mr. Blaszczak.[3]

## I. THE COUNTS ALLEGING VIOLATIONS OF SECTIONS 10(b), 1343, AND 1348 MUST BE DISMISSED FOR FAILURE TO ALLEGE A CRIME

While the Indictment is long on type, it is remarkably short on content with respect to Mr. Huber. The Indictment does not allege that Mr. Huber knew the source of Mr. Blaszczak's information relating to the radiation oncology rule. Nor does it allege that he had any knowledge of Mr. Blaszczak's relationship with that source, or the source's motivation for disclosing the purportedly confidential information to Mr. Blaszczak. In fact, stripped of its conclusory allegations, the Indictment alleges only that Mr. Huber traded on CMS information that he knew was not widely shared. But as *United States v. Newman* and *United States v. Carpenter*, 484 U.S. 19, 108 S. Ct. 316 (1987), make clear, where a downstream tippee allegedly trades on information without knowing who disclosed the information or why, his conduct is not criminal under Section 10(b), Section 1343 or Section 1348. The counts alleging violations of these statutes – Count One, to the extent it alleges a conspiracy to commit securities fraud, Count Two, and Counts Four through Ten, which allege substantive violations – must be dismissed.

### A. The Indictment Does Not Allege Insider Trading Under Section 10(b)

The Indictment does not allege that Mr. Huber knew that the CMS insider(s) who purportedly disclosed confidential information to Mr. Blaszczak did so for personal benefit. In the wake of *United States* v. *Newman*, 773 F.3d 438 (2d Cir. 2014), this deficiency cannot merely be dismissed as an oversight or meaningless technicality. Indeed, it appears the Indictment is artfully pled to suggest the requisite knowledge while conspicuously avoiding alleging it outright, because the government does not have an adequate factual basis to do so. In

_____

[3] Notably, the Indictment similarly fails to make these critical allegations against Mr. Olan, the only other Deerfield analyst named as a defendant in the Indictment.

the absence of this critical allegation, which is necessary to avoid ensnaring innocent market participants in insider trading prosecutions, Count One, to the extent it alleges a conspiracy to violate Section 10(b), and Counts 4 through 10 must be dismissed for failing to allege a crime.

"Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud." *Chiarella v. United States*, 445 U.S. 222, 234-35, 100 S. Ct. 1108, 1117-28 (1980). In an insider trading prosecution, what makes the conduct deceptive and therefore unlawful under Section 10(b) is the insider's "undisclosed, self-serving use of a principal's information to purchase or sell securities." *United States v. O'Hagan*, 521 U.S. 642, 652, 117 S. Ct. 2199, 2207 (1997).[4] Where the insider is merely a tipper who discloses information but does not trade on it, he may be liable under Section 10(b) only if he discloses the information in exchange for a personal benefit. *Dirks v. SEC*, 463 U.S. 646, 662, 103 S. Ct. 3255, 3265 (1983). That is the self-dealing that brings his conduct within the purview of the statute.

In *United States v. Newman,* the Second Circuit reaffirmed what *Dirks* had long ago made plain; namely, that knowledge of that benefit to the insider (the insider's self-dealing) is an essential element necessary to establish a tippee's liability for insider trading under Section 10(b). Although the government had argued that the statute required only that the tippee have knowledge of the insider's breach, the Court chided the government for trying "to revive the absolute bar on tippee trading that the Supreme Court explicitly rejected in *Dirks*," 773 F.3d at 447, and squarely held that knowledge of benefit is required element of the offense:

> [T]o sustain an insider trading conviction against a tippee, the Government must prove *each of the following elements* beyond a

---

[4] Under the classical theory of insider trading, a company insider owes a duty to the corporation's shareholders. Under the misappropriation theory, the tippee owes a duty to the source of the information. *O'Hagan*, 521 U.S. at 651, 117 S. Ct. at 2206-07. In this case, the government's theory is that Mr. Worrall or another CMS employee misappropriated inside information of CMS in breach of a duty owed to the agency.

> reasonable doubt: that (1) the corporate insider was entrusted with a fiduciary duty; (2) the corporate insider breached his fiduciary duty by (a) disclosing confidential information to a tippee (b) in exchange for a personal benefit; (3) the tippee knew of the tipper's breach, that is, he knew the information was confidential *and* divulged for a personal benefit; and (4) the tippee still used that information to trade in a security or tip another individual for personal benefit.

*Id.* at 450 (emphasis added). The Court concluded that requiring a tippee to have knowledge of the tipper's benefit was necessary to comport with the common law requirement of *mens rea* – "which requires that the defendant know the facts that make his conduct illegal" *id.* (citing *Staples v. United States*, 511 U.S. 600, 605 (1994)) – a requirement that is "particularly appropriate in insider trading cases where we have acknowledged 'it is easy to imagine a . . . trader who receives a tip and is unaware that his conduct was illegal and therefore wrongful.'" *Id.* (citing *United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010)). The Court also reasoned that knowledge of the benefit was necessary to satisfy the statutory requirement for willfulness. *Id.* (citations omitted). And while *Newman* was a case premised on the classical theory of insider trading, *Newman* itself (as well as its progeny) made clear that the knowledge of benefit requirement applies equally in cases like this one, which are premised on the misappropriation theory. *Id.* at 446 (citations omitted) ("The elements of tipping liability are the same, regardless of whether the tipper's duty arises under the "classical" or the "misappropriation" theory); *SEC v. Payton*, 97 F. Supp. 3d 558, 562 (S.D.N.Y. 2015) (rejecting argument that knowledge of personal benefit element does not apply in misappropriation cases).[5]

---

[5] Since *Newman* was decided, both the Supreme Court and the Second Circuit have revisited the elements of insider trading under Section 10(b) to provide guidance on the type of benefit that is necessary to sustain a finding of insider trading. *See Salman v. United States*, 137 S. Ct. 420 (2016); *United States v. Martoma*, No. 14-3599, 2017 WL 3611518 (2d Cir. Aug. 23, 2017). Neither of those cases, however, challenged, altered or otherwise revisited the Second Circuit's

Despite the Second Circuit's clear command that the *mens rea* element for insider trading requires a tippee to have knowledge of a benefit received by the insider in exchange for disclosure of information in order for the tippee to be liable under Section 10(b), the government does not include any such allegation against Mr. Huber in the 56-page charging document. Instead, the government relies on a host of suggestive allegations while conspicuously avoiding alleging the requisite knowledge outright. Stripped of its conclusory allegations, however, the Indictment alleges only that Mr. Huber received information he knew was not widely shared outside of CMS. Even if true, that is not a crime.

With respect to the allegations about the radiation oncology rule, which form the basis for the substantive insider trading Counts against Mr. Huber, the government resorts to sleight-of-hand pleading. While the Indictment alleges that Messrs. Blaszczak and Worrall were close friends (Indictment ¶ 21), and that the two men "frequently discussed private-sector employment and other business opportunities" (*id.* ¶ 22), the Indictment does not allege that Mr. Huber knew that Mr. Worrall was Mr. Blaszczak's source for the information relating to the radiation oncology rule, let alone that he knew anything about the relationship between the two men. Accordingly, whatever motivation Mr. Worrall may have had for allegedly providing Mr. Blaszczak with the purportedly confidential information – legitimate or not – that motivation does not render the conduct of Mr. Huber unlawful under Section 10(b). Nor does the allegation that Mr. Huber knew that Mr. Blaszczak received information from CMS insiders, *some* of whom were Mr. Blaszczak's friends (*id.* ¶ 19), because it does not allege that the information relating to radiation oncology came from one of these purported "friends," let alone that it was provided for any unlawful purpose.

holding in *Newman* that knowledge of the benefit is required for a downstream tippee to have committed a crime.

The more general allegations relating to the alleged conspiracy similarly fail to allege an actual crime. In fact, far from evincing any "scheme to defraud" CMS in violation of the insider-trading laws, the allegations about the CMS Contractor – from whom the Indictment alleges Mr. Blaszczak sought to obtain information despite having no prior relationship with him and in exchange for nothing – only prove the flaw in the government's theory of liability. (*See id.* ¶¶ 20, 21). While the government contends this email exchange is somehow proof that Mr. Huber conspired to obtain confidential CMS information in some improper manner, the only thing the email exchange shows is that Mr. Huber knew that Mr. Blaszczak interacted directly with CMS personnel. That is not a crime under any circumstances, let alone under the circumstances present here, where CMS routinely engages stakeholders of all kinds, including investment professionals, about its programs and reimbursement policies. In fact, CMS specifically authorized its employees "to brief nongovernmental individuals or entities on a case-by-case basis." Tavenner Letter (James Decl. Ex. B) at 5.

Finally, the Indictment's allegation that, despite his purportedly failed effort with the CMS Contractor, Mr. Blaszczak told Mr. Huber that "he thought he would 'get a look'" at the reimbursement rates for genetic testing before they were made public (Indictment ¶ 21) does not salvage the insider trading conspiracy against Mr. Huber. The Indictment does not allege that Mr. Huber knew from whom Mr. Blaszczak might get that information, that the source of the information would receive anything of value in return, or that it would be shared with Mr. Blaszczak for any improper purpose at all.

These deficiencies cannot be dismissed as mere technicalities, because without allegations that Mr. Huber knew of a benefit received by an insider in exchange for confidential information, the Indictment does not allege a conspiracy to violate or a violation of Section 10(b)

at all.  Although admittedly rare, where a defendant moves to dismiss an indictment on the grounds that the facts alleged do not state an offense, courts can and do decide whether those facts, if true, establish criminal liability.  *See, e.g.*, *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (dismissing tax fraud and perjury counts because conduct alleged in indictment did not violate applicable statute); *United States v. Aleynikov*, 676 F.3d 71, 76-79 (2d Cir. 2012) (dismissing indictment because transferring proprietary computer source code did not constitute offense under National Stolen Property Act); *United States v. Heicklen*, 858 F. Supp. 2d 256 (S.D.N.Y. 2012) (dismissing indictment where facts alleged did not constitute the crime of attempting to influence the actions of a juror); *cf. United States v. Curtis*, 506 F.2d 985, 989 (10th Cir. 1974) (dismissing mail fraud indictment that tracked language of statute but failed to explain how alleged conduct constituted a "misrepresentation[,] scheme or artifice").

Although the government may point to decisions in this District that have found that knowledge of benefit is a "sub-element" that need not be pleaded in the indictment, none of those decisions supports the adequacy of the charges against Mr. Huber because they are all readily distinguishable from this case.  *See* Tr., *United States* v. *Conradt*, 12 Cr. 887 (ALC) (S.D.N.Y. Jan. 29, 2015), ECF No. 173 (James Decl. Ex. C) at 3; Tr., *Whitman*, 12 Cr. 125 (JSR) (S.D.N.Y. June 21, 2012) (James Decl. Ex. D) at 21-25; *United States v. Rengan Rajaratnam*, 13 Cr. 211 (NRB), 2014 WL 1554078, at *2 (S.D.N.Y. Apr. 17, 2014); *see also United States v. Cunniffe*, 15 Cr. 287 (LTS) (S.D.N.Y. Jan. 19, 2016), ECF No. 64 (James Decl. Ex. E) at 17-18.[6]

---

[6] At least one other court outside this District has reached a similar conclusion.  *See United States v. Santoro*, 647 F. Supp. 153, 170-71 (E.D.N.Y. 1986), *rev'd on other grounds sub nom.*, *United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988)*.*  In *Santoro*, however, the defendants were alleged to have been part of "a major organized crime family that controlled a powerful labor union and used that relationship" to, amongst other things, extort two freight companies who had proposed to merge.  *Id.* at 158, 183-84.  As one of the goals of the extortion scheme was

*Rajaratnam* was decided before the Second Circuit confirmed in *Newman* that knowledge of

benefit is required for tippee liability under Section 10(b), and in any event, the government

proffered evidence demonstrating that Rajaratnam was aware that the insider received payments

in exchange for the information. *See* Gov't Opp. Br. to Motion to Dismiss, *Rajaratnam*, 13 Cr.

211 (NRB) (S.D.N.Y. Feb. 28, 2014), ECF No. 37 at 7-8. (The defendant was nevertheless

acquitted in that case.). So too with *Whitman,* where the government proffered that it had

witness testimony, as well as wiretap and consensual recordings sufficient to demonstrate the

defendant's *mens rea* even if knowledge of benefit were required. *See* Gov't Opp. Br. to Motion

to Dismiss*, United States v. Whitman*, 12 Cr. 125 (JSR) (May 11, 2012), ECF No. 36 at 20; *see*

*also United States v. Whitman*, 115 F. Supp. 3d 439, 446 (S.D.N.Y. 2015) (noting that in a tape-

recorded conversation Whitman complained that he lost access to the "mole" inside the company

because his co-conspirator had not paid the insider as much money as the insider had demanded).

And while the judge declined to grant the defendant's motion to dismiss in *Conradt* – a post-

*Newman* case – finding that knowledge of benefit was a sub-element that need not be alleged in

the indictment, that finding was largely an academic point because the government had moved to

dismiss the case. *See* Tr. at 5-14, *Conradt*, (S.D.N.Y. Jan. 29, 2015) (James Decl. Ex. C); *Nolle*

*Prosequi*, *United States v. Conradt*, No. 12 Cr. 887 (ALC) (S.D.N.Y. Feb. 3, 2015), ECF No.

170 (James Decl. Ex. F) ¶ 3. Finally, far from supporting the viability of the 10(b) charges in

this case, *Cunniffe* only underscores their deficiency. As alleged in the indictment, *Cunniffe*

involved a direct tippee who allegedly used a portion of the profits from the insider trading

scheme to pay for the tipper's wedding, so there simply was no question about the unlawfulness

of the defendant's alleged conduct. Indictment ¶ 9, *United States v. Cunniffe (Stewart)*, No. 15

---

to retain the tipper "in a position of power in the merged . . . company," *id.* at 184, there could
have been little concern that the defendants were unaware of the tipper's personal benefit.

Cr. 287 (LTS) (S.D.N.Y. July 15, 2015), ECF No. 25; *see also* Gov't Opp. Br. to Motion to

Dismiss, *Cunniffe (Stewart)*, (Oct. 16, 2015), ECF No. 46 at 19-20. As *Cunniffe* demonstrates,

the government is acutely aware of what conduct is criminal under *Newman* and how to allege it,

making its failure to do so in this case all the more telling.

**B.      The Indictment Does Not Allege Wire Fraud Under Section 1343**

The failure to allege that Mr. Huber had knowledge of any benefit provided to Mr.

Worrall or any other CMS insider dooms not only the Counts alleging violations of Section

10(b), but the Counts alleging a violation of, or conspiracy to violate, Section 1343 as well.

Sections 10(b) and Section 1343 have slightly different elements at the margins, but, at their

core, both statutes require a scheme or artifice to defraud. While fraud can be perpetrated

through either false statements or omissions, silence can only be fraudulent where there is a duty

to disclose. *See Carpenter*, 791 F.2d 1024, 1035 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987)

(holding that "the concealment by a fiduciary of material information which he is under a duty to

disclose . . . is a violation of the mail [and wire] fraud statute") (emphasis added) (internal

citations omitted). But just as with Section 10(b), liability under Sections 1343 is not triggered

by a mere breach of a duty – something more is required. That "something" is the same type of

self-dealing by the insider that Section 10(b) proscribes – knowledge of which is necessary to

prosecute a downstream tippee like Mr. Huber.

We have not been able to identify a single case in this District in which the

government sought to prosecute a downstream tippee for insider trading by charging wire fraud

under Section 1343 in the decade prior to *Newman*. While we are not aware of any courts in this

District that have had to address the question of whether a tippee must have knowledge of the

benefit provided to the insider to support liability under this statute, the Supreme Court's

decision in *Carpenter*, 484 U.S. at 19, 108 S. Ct. at 316, makes plain that knowledge of the benefit is in fact required.

In *Carpenter*, the Supreme Court affirmed a *Wall Street Journal* reporter's convictions for mail and wire fraud based on the reporter's pre-publication disclosure of the paper's "Heard on the Street" column to a group of individuals who traded on that information. While the Court's opinion was focused on the question of whether "confidential business information" constituted property under the statutes, the opinion made clear that it was not the reporter's disclosure alone that made his conduct unlawful. Rather, what made his conduct criminal under the mail and wire fraud statues was his "appropriating [of the paper's] confidential business information *for his own use.*" 484 U.S. at 28, 108 S. Ct. at 322, (emphasis added). Indeed, in finding that the reporter's conduct fell within the scope of the mail and wire fraud statutes, the Court relied on *Diamond v. Oreamuno*, 24 N.Y.2d 494, 497 (1969), in which the New York Court of Appeals observed:

> It is well established, as a general proposition, that a person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with another is not free to exploit that knowledge or information *for his own benefit . . . .*

484 U.S. at 27-28, 108 S. Ct. at 321 (emphasis added). In *Carpenter*, the reporter had "passed along to his co-conspirators confidential information belonging to the Journal, pursuant to an ongoing scheme to share profits" from the subsequent trading. 484 U.S. at 27, 108 S. Ct. at 321. Accordingly, there was no question that he acted for personal benefit (and that the tippees were well aware of that fact). Nevertheless, the Court's opinion made clear that the reporter's receipt of some personal benefit was an indispensable element of the fraudulent scheme.

Ten years later, in *O'Hagan*, 521 U.S. at 642, 117 S. Ct. at 2199, the Court underscored the point when, relying on *Carpenter*, it upheld the misappropriation theory of

insider trading under Section 10(b).  Noting that it had "addressed fraud of the same species" in *Carpenter*, the Court concurred with the government's assessment that *Carpenter* was "a particularly apt source of guidance here, because [the mail fraud statutes] (like Section 10(b)) *ha[ve] long been held to require deception, not merely the breach of a fiduciary duty*."  521 U.S. at 654, 117 S. Ct. at 2208 (citations omitted) (emphasis added).  And just as in *Carpenter*, it was the insider's use of the misappropriated information for his own benefit – that is, his own self-dealing – that rendered his conduct deceptive and therefore actionable under Section 10(b).  *Cf. United States* v. *Chestman*, 947 F.2d 551, 571 (2d Cir. 1991) (*en banc*) (reversing Rule 10b-5 and mail fraud convictions; "The fortunes of Chestman's mail fraud convictions are tied closely to his securities fraud convictions. 'Chestman's mail fraud convictions,' the government concedes, 'were based on the same theory as his Rule 10b-5 convictions.'"); *United States* v. *Reed*, 601 F. Supp. 685, 689-720 (S.D.N.Y. 1985) (on motion to dismiss indictment, analyzing 10b-5 misappropriation and mail fraud counts in tandem), *rev'd on other grounds*, 773 F.2d 477 (2d Cir. 1985)

Absent knowledge of the benefit – which is what renders the insider's conduct deceitful and unlawful under the statute – the tippee simply has not knowingly engaged in a fraudulent scheme under Section 1343.  In other words, to establish a tippee defendant's guilt under Section 1343, the government has to prove that he knew the insider was disclosing information in exchange for a benefit – the conduct that rendered the insider's disclosure deceptive within the meaning of the statute – to show that the defendant "engage[d] in or attempt[ed] to engage in a pattern or course of conduct designed to deceive."  *United States v. Ragosta*, 970 F.2d 1085, 1089 (2d Cir. 1992).  Were the rule otherwise, the government would be able to circumvent over thirty years of insider trading case law – developed to ensure that

innocent market participants were not ensnared in criminal prosecutions – simply by using the wire fraud statute to circumvent knowledge requirements it could not otherwise meet. *See Dirks*, 463 U.S. at 658-60 & n.17, 103 S. Ct. at 3263-65 & n.17.

As we detail above, however, the 56-page Indictment studiously avoids making the allegation that Mr. Huber had knowledge of any benefit purportedly flowing to Mr. Worrall. Instead, the Indictment alleges that Mr. Huber knew the information that Mr. Worrall provided to Mr. Blaszczak had been obtained "in breach of a duty" or was disclosed "improperly." (Indictment ¶ 21). But as *Carpenter* teaches, a "breach" is not in and of itself fraudulent. And an "improper" disclosure is not necessarily deceptive. Under these circumstances, the fact that the Indictment tracks statutory language in the actual charging paragraph does not render the wire fraud counts sufficient. *See, e.g.*, *Pirro*, 212 F.3d at 94 (dismissing tax fraud and perjury counts of indictment: allegation that defendant had an "ownership interest" in an entity did not establish that defendant failed to report his "share ownership" on his tax return as required by law because the former term was broader than the latter); *cf. United States v. Berlin*, 472 F.2d 1002, 1007-08 (2d Cir. 1973) (dismissing indictment charging defendant with aiding and abetting submission of false documents because defendant's knowledge of falsity "is not necessarily implied from the allegation that he 'counseled and caused' the statement to be made"). Because the Indictment fails to allege that Mr. Huber conspired to violate, or violated, the wire fraud statute, Count Two, to the extent it alleges a conspiracy to commit wire fraud, and Count Nine must be dismissed.

### C. The Indictment Does Not Allege Securities Fraud Under Section 1348

The same holds true with respect to Count Ten, which charges Mr. Huber with securities fraud under Section 1348, and Count Two, to the extent it alleges a conspiracy to commit securities fraud. The Section 1348 counts allege the same scheme "to defraud CMS of

confidential information related to CMS's proposed radiation oncology rule by improperly

obtaining that information through deceptive means," as does the count premised on 10(b) and

Section 1343.  And it is deficient for the same reason:  Without alleging that Mr. Huber had

knowledge of any benefit provided to Mr. Worrall, the Indictment does not allege that he

participated in a fraudulent scheme of any kind.

Like Section 10(b), which criminalizes the use of any "device, scheme or artifice

to defraud" in connection with "the purchase and sale of any security," 17 C.F.R. § 240.10b-5(a),

Section 1348 makes it unlawful to execute or attempt to execute a "scheme or artifice to defraud"

any person "in connection with" the stock of companies that trade on the New York and

American Stock Exchanges, as well as those that are required to file periodic reports with the

SEC.  While Congress intended to extend the reach of Section 1348 beyond the confines of

Section 10(b) to address particular issues, the statute was not directed at insider trading.  Added

to the Code as part of the "Corporate and Criminal Fraud Accountability Act of 2002"

("CCFAA"), which was enacted as Title VIII to the Sarbanes-Oxley Act of 2002, Section 1348

was enacted to address perceived deficiencies in Title 15 to address the types of corporate and

accounting scandals that were revealed in the wake Enron's bankruptcy.  *See* The Corporate and

Criminal Fraud Accountability Act of 2002, S. Rep. 107-146, 2002 WL 863249, at *6 (May 6,

2002).  *See id.* at *2-*6 (discussing "Enron's collapse" and "the aftermath of Enron's collapse

and the cover up" and the "shortcomings in current law that the Enron matter has publicly

exposed").  By enacting the statute, Congress sought to relieve prosecutors of the burden of

showing that corporate actors violated specific accounting and reporting rules when pursuing

financial-statement fraud cases, to make clear that certain fraudulent practices could be criminal

even in the absence of the purchase or sale of a security, and to impose greater penalties than

those available under Section 10(b).  *See, e.g.,* Tom Hanusik, *Sarbanes-Oxley:  Broader Statutes – Bigger Penalties,* United States Attorneys' Bulletin, Vol. 51, No. 3 at 14-15 (May 2003), *available at* https://www.justice.gov/sites/default/files/usao/legacy/2006/02/14/usab5103.pdf.

Without question, Congress did not seek to relieve prosecutors of the burden of proving knowing participation in a fraudulent scheme.  *See* S. Rep. 107-146, 2002 WL 863249, at *30 ("This new securities fraud offense does not lower the standard of criminal intent prosecutors must meet to convict securities fraud offenders.").  And to satisfy that requirement with respect to an alleged remote tippee under Section 1348 – just as it must under Sections 10(b) and 1343 – the government must demonstrate that he had knowledge of the benefit to the insider, which is what renders the conduct fraudulent and therefore criminal under all three statutes.

While two district court judges in the Northern District of Georgia have concluded that a tippee's knowledge of benefit is not required under Section 1348, *see United States v. Slawson*, No. 1:14 CR-00186-RWS-JFK, 2014 WL 5804191 (N.D. Ga. Nov. 7, 2014), *report and recommendation adopted* 2014 WL 6990307 (N.D. Ga. Dec. 10, 2014); and *United States v. Melvin*, No. 3:14-Cr-00022-TCB-RGV, 2015 WL 7116737, at *2 (N.D. Ga. May 27, 2015), *report and recommendation adopted*, 143 F. Supp. 3d 1354, (N.D. Ga. Nov. 10, 2015), neither of those decisions is persuasive.  In both cases, the defendants moved to dismiss their Indictments*,* arguing that the requirements under 10(b) should be read into Section 1348. Neither defendant, however, raised the argument that we present here, which is based on the need to show deception to establish a fraudulent scheme under Section 1348.  Not surprisingly then, in ruling on their motions, neither court wrestled with the question of what renders the insider's conduct deceitful under the statute and instead based their decisions primarily on the

lack of prior "authority applying [§ 10(b) and Rule 10b-5] case law to the Title 18 security violations" alleged in the indictments. *See Melvin*, 143 F. Supp. 3d at 1375 (quoting *Slawson*, 2014 WL 5804191, at *6).[7] These decisions therefore provide no guidance for the analysis the court must undertake here, which plainly warrants dismissal of the securities fraud counts against Mr. Huber.

## II. THE COUNTS ALLEGING VIOLATIONS OF SECTIONS 641 AND 371 MUST BE DISMISSED UNDER THE VOID FOR VAGUENESS DOCTRINE AND THE RULE OF LENITY

The government seeks to circumvent *Newman's* requirements for prosecuting downstream tippees by claiming that Mr. Huber stole government property in violation of 18 U.S.C. § 641 and participated in a *Klein* conspiracy under 18 U.S.C. § 371 when he indirectly received information from an unknown source relating to the actions of a government agency that regularly shares information with the public. As applied in this case, both of these statutes are unconstitutionally vague and violate the rule of lenity. We respectfully submit that the charges based on these statutes – Counts One and Three – must be dismissed.

### A. As Applied in this Case Section 641 is Unconstitutionally Vague and Violates the Rule of Lenity

The Section 641 charge against Mr. Huber is virtually unprecedented. Long on the books, Section 641 has rarely been used to prosecute defendants for converting governmental information, as opposed to money or tangible property. In the few prior cases that have charged a violation of Section 641 based on the theft of information, the government entities involved were conspicuously secretive agencies, such as a law enforcement or national security-related agency, not agencies like CMS, which regularly communicates directly with individuals and entities. Moreover, the defendants in prior cases were direct recipients of the confidential

---

[7] Notably, the defendants who went to trial in both cases were acquitted, and thus neither decision will be the subject of appellate review.

information and intimately aware of the unlawful circumstances by which the information was obtained. *See, e.g.*, *United States v. Girard*, 601 F.2d 69 (2d Cir. 1979) (charging current and former Drug Enforcement Administration ("DEA") agents for selling the names of drug informants); *United States v. Jones*, 677 F. Supp. 238 (S.D.N.Y. 1988) (charging defendant who overheard criminal investigation information at federal prosecutors' office); *United States v. Elefant*, 999 F.2d 674, 675 (2d Cir. 1993) (charging Federal Bureau of Investigations ("FBI") translator where he showed target of a criminal investigation FBI documents and told him that his phone was tapped). Following the Second Circuit's decision in *Newman*, however, the government has resorted to Section 641 to try to prosecute downstream tippees for insider trading.[8] But the statute cannot be read to reach Mr. Huber's alleged conduct charged in the Indictment without violating Due Process.

"The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812 (1954). Because of the breadth and ambiguity of Section 641, which criminalizes, among other things, the use or transfer of government property "without authority" – a statutory phrase "virtually devoid of any meaning when applied to the transfer of information," *United States v. Lambert*, 446 F. Supp. 890, 898 (D. Conn. 1978), *aff'd sub nom.*, *Girard*, 601 F.2d 69, courts have construed the statute as "merely establishing a penalty for the violation of other, more particular prohibitions against disclosure," such as federal statutes, administrative rules and regulations and "perhaps longstanding government practices." *Id.* at 899; *see also Jones*, 677 F. Supp. at 241

---

[8] Since *Newman*, the government has charged downstream tippees with conspiring to violate Section 641 in this case and in *United States v. Valvani*, No. 16-cr-412 (SHS) (S.D.N.Y. June 15, 2016). The propriety of the government's charges in *Valvani* was never litigated due to the untimely death of the defendant.

(citing the *Lambert* limiting construction).  While that limiting construction helps to ensure "that ordinary people can understand what conduct is prohibited" as Due Process requires, *see United States v. Morrison*, 686 F.3d 94, 103 (2d Cir. 2012) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 1858 (1983)), *cert. denied*, 568 U.S. 1125, 133 S.Ct. 955 (2013), courts have made clear that the constitutionality of the application of Section 641 must nevertheless be considered "on a case by case basis in light of the particular type of information involved and the character of the prohibition against disclosure," *Lambert*, 446 F. Supp. at 899.

Here, the application of Section 641 to Mr. Huber's alleged conduct does not survive constitutional scrutiny.  Although the Indictment references the STOCK Act, 15 U.S.C. § 78u-1(h), and the Standards of Ethical Conduct for Employees of the Executive Branch, 5 C.F.R. § 2635.703 ("Standards for Ethical Conduct"), as the particular prohibitions against disclosure that purportedly put Mr. Huber on notice that his receipt of information about CMS's proposed radiation oncology rule was unlawful (Indictment ¶¶ 15, 16), there is nothing in either the statute or the regulation that provides any guidance – let alone the type of clear guidance necessary for the imposition of criminal sanctions – that the information he received fell within the purview of these provisions.  The STOCK Act merely provides for civil penalties for federal officials who disclose material nonpublic information obtained in the course of performing their official duties.  It does not define what constitutes material nonpublic information.  And the definition of nonpublic information in the Standards for Ethical Conduct is entirely circular, providing only that material nonpublic information is information that "has not actually been disseminated to the general public and is not authorized to be made available to the public on request."  5 C.F.R. § 2635.703. Under these circumstances, the statute and regulation fail to

provide downstream recipients like Mr. Huber with adequate notice as to what CMS disclosures are and are not permissible, and therefore cannot be the basis for criminal liability.

This case differs markedly from those in which the application of Section 641 to the disclosure of governmental information has withstood constitutional scrutiny. *United States v. Lambert*, for example, involved the prosecution of current and former DEA agents for selling information derived from the DEA's database – including the names of potential informants and the status of governmental investigations – to individuals involved in the illegal drug-trafficking business. 446 F. Supp. 890. Not only was the information at issue the type of information that has long been understood by both DEA agents and the general public to be confidential, it was clearly defined as such by the Agents Manual of the Drug Enforcement Administration, with which both defendants were intimately familiar. *Id.* at 900 (noting that the manual defined prohibited disclosure of "official information" to persons known or suspected to be involved in narcotics trafficking and defined "official information" to include "identification of investigative sources or targets, and the identify of undercover agents") (citations omitted). And the disclosure of information from the DEA's database was subject to a complex set of rules, which defined to whom and under what circumstances the information could be disclosed. *Id.* Given the "type of information involved and the character of the prohibition against disclosure," *id.* at 899, as well as the fact that the defendants sought to profit from the sale of the information, the court had little difficulty concluding that the agents were on notice that their conduct was unlawful. *Id.*

The court applied a similar analysis in *United States v. Jones*, where the defendant was charged under Section 641 for trying to sell information about an ongoing criminal investigation that he overheard during a visit to the United States Attorney's Office. 677 F.

Supp. at 238. Rejecting the defendant's constitutional challenge to the criminal complaint, the court found the defendant would have known that the information was confidential "given the government's long standing practice of maintaining the confidentiality of information relevant to on-going criminal investigations, and given the government's obvious interest in maintaining such confidentiality." *Id.* at 241. Moreover, Jones had tried to sell the information to the target of the investigation. *Id.* As the *Jones* court and others have recognized, confidentiality is essential to law enforcement and defense agencies, since disclosure of sensitive information can interfere with their ability to conduct investigations, protect witnesses, locate suspects, and develop military strategy, among other critical functions. *See id.*; *United States v. Fowler*, 932 F.2d 306, 309 (4th Cir. 1991) (upholding conviction of former Department of Defense ("DOD") employee who obtained classified documents disclosing military strategy and weapons procurement plans, disclosure of which could have an impact on national security, to his new employer, a defense contractor); *see also In re Dep't of Investigation of City of New York*, 856 F.2d 481, 484 (2d Cir. 1988) (observing that the law enforcement privilege is motivated by the need "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation"). The information and agencies involved in these prior Section 641 cases that have withstood constitutional scrutiny – law enforcement information related to ongoing investigations and classified military secrets – are a far cry from the type of information and agency involved in this case and only highlight the infirmity of the Section 641 charge against Mr. Huber.

The Indictment also references CMS's *internal* Employee Nondisclosure Policy that it alleges Mr. Worrall violated when he purportedly disclosed information relating to the radiation oncology rule. (Indictment ¶ 15). That internal policy defines nonpublic information as information the employee "knows or reasonably should know" is not available to the general public, including information that is "designated confidential by the agency" or that "has not actually been disseminated to the general public and is not authorized to be made available to the public upon request," and advises that "no information should be provided to the public unless it is already available to the public, such as through a public web page or another publication." CMS Employee Nondisclosure Policy (James Decl. Ex. G) at 2. Setting aside the question of whether the policy contains the "delimitation and clarification" necessary to provide adequate notice to Mr. Worrall that his alleged conduct was unlawful under Section 641, *Girard*, 601 F.2d at 71, there can be no argument that the policy – which was not published by the agency or otherwise generally made available to the public – provided the constitutionally required notice to Mr. Huber.

We are not aware of a single case in which a non-governmental employee was found liable under Section 641 for receiving governmental information based solely on the violation of an unpublished policy, regulation or rule. While *United States v. McAusland*, 979 F.2d 970 (4th Cir. 1992) – a case involving the disclosure of confidential bid information relating to DOD procurement contracts – held that published regulations are not the "exclusive method of preventing vagueness," *id.* at 975, the court did not rely on unpublished agency policies to establish that the defendants had adequate notice that their conduct was unlawful.[9] Instead, the court cited "several categories of evidence" to establish that the defendants knew disclosure was

---

[9] Nor have any subsequent cases cited *McAusland* for this proposition.

without authority, including published regulations in effect at the relevant time prohibiting the disclosure of bid information, and confidential legends on documents obtained by the defendants. *Id.* at 975. In the face of those circumstances, the court concluded that the defendants had adequate notice that their conduct was unlawful and rejected their void for vagueness challenge.

None of those circumstances are present here with respect to Mr. Huber. Not only were there no published regulations, rules or policies specifically prohibiting the disclosure of information relating to CMS's programs and reimbursement policies, there is no allegation that Mr. Huber was provided with any CMS documents that were marked as confidential or otherwise indicated their disclosure was prohibited. Moreover, the government does not even allege that CMS treated information relating to its reimbursement policies as confidential. The Indictment alleges only that CMS issues its proposed and final Medicare reimbursement rules after markets close, because the rules can affect stock prices for impacted companies. (Indictment ¶ 14). It does not allege that CMS's decision-making process is confidential, or that CMS employees are not authorized to discuss the agency's programs with outside stakeholders. Indeed, CMS regularly engages with members of the public on these very topics, including with regard to "actions the Agency is proposing to take or implement" and "permits employees to brief non-governmental individuals or entities on a case-by-case basis, as determined by the employee's supervisor and in concert with their official responsibilities." Tavenner Letter (James Decl. Ex. B) at 1, 5. The government's failure in this regard cannot be dismissed as inconsequential or the result of a mere oversight. In the one other post-*Newman* Section 641 case in this District, which involved allegations that the defendant conspired to convert information from the Food and Drug Administration ("FDA"), the government explicitly alleged in great detail why the information and internal processes at issue, regarding the FDA's

Abbreviated New Drug Application ("ANDA") process, was strictly confidential.  *See*

Indictment, *United States v. Valvani*, No. 16-cr-412 (SHS) (S.D.N.Y. June 15, 2016).  In that

case, the government alleged:

> The FDA's evaluation of ANDAs was confidential information.
> The FDA did not disclose to the public when, if ever, an ANDA
> would be approved; the FDA also did not disclose to the public the
> status of its deliberations about an ANDA or any related citizen
> petitions. The protection of this confidential information was
> central to one of the FDA's core missions: the efficient approval of
> generic drugs.

*Id.* ¶ 7.  The government's failure to make the same type of allegation here as it did in *Valvani* is

telling.  In light of CMS's longstanding practice of disclosing information to a variety of

stakeholders, both within and outside the government, it appears the government has not alleged

more here for the simple reason that it cannot do so.

In the absence of any published policies, regulations, or statutes providing

meaningful guidance to non-governmental employees like Mr. Huber as to what CMS

information could not be disclosed, the application of Section 641 to his alleged conduct violates

Due Process.  On the facts of this case, Section 641 simply does not "define the criminal offense

with sufficient definiteness that ordinary people can understand what conduct is prohibited and

in a manner that does not encourage arbitrary and discriminatory enforcement."  *Morrison*, 686

F.3d at 103 (quoting *Kolender*, 461 U.S. at 357, 103 S. Ct. at 1858); *see also United States v.*

*Tana*, 618 F. Supp. 1393, 1397 (S.D.N.Y. 1985) (holding Section 641 unconstitutionally vague

as applied to defendant who converted property of company that received government loan since

statute does not clearly indicate that it applies to property in which the government holds a

security interest).  Accordingly, Count One, to the extent it alleges a conspiracy to violate

Section 641, and Count Three must be dismissed.

The rule of lenity, which "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them," *United States v. Santos*, 553 U.S. 507, 514, 128 S.Ct. 2020, 2025 (2008), provides an alternate basis for dismissal. "[T]he canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 1225 (1997). The Supreme Court in a litany of recent decisions has made clear that ambiguous statutes must be interpreted narrowly so they are not used to prosecute innocent conduct. *See McDonnell v. United States*, 136 S. Ct. 2355, 2360, 195 L. Ed. 2d 639 (2016) (interpreting the term "official act" within the Hobbs Act and honest services statute narrowly to avoid vagueness concerns); *United States v. Yates*, 135 S. Ct. 1074, 1088 (2015) (citing the rule of lenity in providing a limiting construction of the term "tangible objects" within the Sarbanes-Oxley Act); *Skilling v. United States*, 561 U.S. 358, 411, 130 S. Ct. 2896, 2933 (2010) (holding that the rule of lenity supported a narrow reading of the honest services fraud statute); *Cleveland v. United States*, 531 U.S. 12, 25, 121 S. Ct. 365, 374 (2000) (holding that the rule of lenity warranted excluding licenses from the definition of property under the mail fraud statute). Because Section 641 is unmistakably ambiguous when applied to the transfer of governmental information, *Lambert*, 446 F. Supp. at 897-98, especially in the case of downstream recipients who are not government employees, the rule of lenity requires that the court, at minimum, adopt the same limiting construction of the statute that courts have applied in the context of vagueness challenges and limit the statute's reach to governmental information whose disclosure is expressly prohibited by a published statute or regulation that puts the public on notice of the protected nature of the specific information. In the absence of any such published statute or regulation here, the Section 641 counts must be dismissed.

Finally, we respectfully submit that applying the rule of lenity here, government information simply is not a "thing of value" under Section 641. While we recognize that the Second Circuit held otherwise in *Girard*, the Supreme Court has not yet addressed the issue and there is a circuit split with the Ninth Circuit on the other side. Since neither the text nor the legislative history of Section 641 indicates whether the statute was intended to prohibit the unauthorized disclosure of government information, the Ninth Circuit's ruling that Section 641 applies only to tangible objects is the correct one. *Chappell v. United States*, 270 F.2d 274 (9th Cir. 1959) (reversing conviction under Section 641 for theft of government services and labor, on the basis that neither the text or legislative history of Section 641 indicate that it was intended to apply to intangible goods). We respectfully submit the time is ripe for reconsidering the reach of this ambiguous statute and rejecting its application here for this additional reason.

### B.  As Applied in this Case Section 371 is Unconstitutionally Vague and Violates the Rule of Lenity

The *Klein* conspiracy charged in Count One similarly fails to pass constitutional muster as applied in this case to Mr. Huber. The law is clear that in order to prove a conspiracy to defraud the United States under 18 U.S.C. § 371, the government must show that a defendant entered into an agreement to obstruct a lawful function of the Government by deceitful or dishonest means. *See United States v. Coplan*, 703 F.3d 46, 61 (2d Cir. 2012) (citing *United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996)). The very few insider trading cases that have been charged under Section 371's defraud prong are easily distinguished and make clear the inadequacies of the *Klein* conspiracy charges against Mr. Huber based on the circumstances alleged here.[10] Those cases involved (1) *direct recipients* of government information (2) who

---

[10] We are not aware of any judicial opinions within this Circuit addressing insider trading schemes charged under Section 371's defraud prong in the 40 years preceding *Newman*, and only one case has been charged under the defraud prong since *Newman*, which was also the short-

used *dishonest means* to obtain information they (3) clearly *knew was improperly disclosed*. In *Haas v. Henkel*, 216 U.S. 462, 30 S. Ct. 249 (1910), for example, the defendants bribed a Department of Agriculture statistician to falsify cotton crop reports and provide them with the official reports in advance of publication, to gain a speculative advantage in the commodities market. 216 U.S. at 476-77, 30 S. Ct. at 252-53. And in *United States v. Peltz*, 433 F.2d 48 (2d Cir. 1970), the defendant traded on confidential information about matters pending before the Securities and Exchange Commission ("SEC"), a law enforcement agency that has long displayed "conspicuous . . . zeal" in protecting the confidentiality of its pending investigations, and which he obtained directly from the inside source in exchange for providing the insider with the services of a prostitute. *Peltz*, 433 F.2d at 52. In each of those cases, there was little doubt that the defendants knew that their conduct was unlawful.

None of those circumstances is present here. The government does not allege Mr. Huber ever engaged with CMS or even knew who Mr. Blaszczak's contacts were. Nor does it allege that Mr. Huber made misrepresentations to anyone at CMS, or was aware of any misrepresentations being made on his behalf or otherwise. Moreover, unlike the defendants in *Haas* who bribed a government official to falsify crop reports, or the *Peltz* defendant who gifted an SEC branch chief with prostitutes in order to learn of matters under consideration by the Commission, the government does not allege that Mr. Huber provided anything of value to anyone at CMS in exchange for information, or that he was aware of Mr. Blaszczak purportedly doing so. In light of CMS's longstanding practice of sharing information with stakeholders, Mr. Huber had no reason to suspect that the alleged "tip" was improperly obtained, and the Indictment does not plausibly allege otherwise. *Cf. Peltz*, 433 F.2d at 52 (affirming conviction

---

lived Valvani prosecution. *Valvani*, No. 16-cr-412 (SHS). Nor are we aware of any opinions addressing the applicability of the *Klein* conspiracy doctrine to downstream tippees.

under Section 371 in light of the "conspicuous zeal" the SEC possesses with respect to its ongoing investigations).

Stripped of its conclusory allegations that Mr. Huber knew the CMS information that Mr. Blaszczak provided was obtained "improperly," the Indictment alleges only that Mr. Huber encouraged Mr. Blaszczak to reach out to a CMS Contractor (Indictment ¶ 20); that Mr. Blaszczak shared information he learned from employees of CMS (*Id.* ¶¶ 27, 28, 34); and that Mr. Blaszczak did so before he shared the same information with others. (*Id.* ¶¶ 27, 28, 30, 35, 36). Indeed, in the "to wit" clause of the charging paragraph for the Section 641 violation, the Indictment alleges only that Mr. Huber received information that he "knew was obtained from CMS." (*Id.* ¶ 79). But asking a public-facing agency for information is not a crime, nor is it a crime to learn pertinent facts before one's competitors. *Dirks*, 463 U.S. at 658, 103 S. Ct. at 3263 ("Imposing a duty to disclose or abstain solely because a person knowingly receives material nonpublic information from an insider and trades on it could have an inhibiting influence on the role of market analysts, which the SEC itself recognizes is necessary to the preservation of a healthy market."). If the government were allowed to prosecute Mr. Huber on the facts of this case, the government would be able to bring felony charges against a wide range of people who, like Mr. Huber, would have no reason to suspect their conduct was illegal. The government could, for example, prosecute a professor who decides to ask a former colleague at the National Institutes of Health what factors are considered in awarding government research grants, and the colleagues with whom he shares that information; or a patient who asks his doctor to inquire with CMS whether a treatment he is considering undergoing will be covered by Medicare in the future. Under the sweeping interpretation of Section 371 underlying the government's case, prosecutorial discretion would be the only thing preventing the government

from bringing charges in those situations. Such an interpretation obviously cannot withstand constitutional scrutiny. *See Kolender*, 461 U.S. at 352, 357, 103 S. Ct. at 1855, 1858 ("void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness . . . and in a manner that does not encourage arbitrary and discriminatory enforcement"); *Smith v. Goguen*, 415 U.S. 566, 574, 94 S. Ct. 1242, 1247 (1974) (where statute fails to provide sufficient guidelines for enforcement it may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.").

The Second Circuit has repeatedly expressed concern about the potential breadth of the *Klein* conspiracy, observing that it is a common law crime that "warrants considerable judicial skepticism." *Coplan*, 703 F.3d at 61;[11] *see also United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) (observing that courts "must be especially alert to 'subtle attempts to broaden the already pervasive and wide sweeping nets of conspiracy prosecutions'") (quoting *United States v. Rosenblatt*, 554 F.2d 36, 40 (2d Cir. 1977)). The Court should apply that skepticism here and reject the government's attempt to expand the application of the *Klein* doctrine to reach cases like this one, where there are no indicia of fraud alleged, and dismiss the *Klein* conspiracy charge as void for vagueness. *Cf. Dennis v. United States*, 384 U.S. 855, 860, 86 S. Ct. 1840, 1843 (1966) (The broad language of Section 371 must be "scrutinized carefully," because of the possibility that its "wide net may ensnare the innocent as well as the culpable.").

---

[11] In *Coplan,* the defendants argued that their convictions for participating in a *Klein* conspiracy should be dismissed because Section 371 should be limited to schemes to obtain government money and property. While the Second Circuit found that argument persuasive, it was constrained by Supreme Court precedent to construe the statute to reach conspiracies "for the purpose of impairing, obstructing, or defeating" the lawful functions of government agencies. *Coplan,* 703 F.3d at 61 (citing *Dennis v. United States,* 384 U.S. 855, 861, 86 S. Ct. 1840, 1844 (1966)). The Court nonetheless reversed two of the defendants' convictions under Section 371 for insufficient evidence. *Id.* at 62-72.

The *Klein* conspiracy also should be dismissed under the rule of lenity.  As with Section 641, Section 371 is clearly ambiguous in cases involving government information.  The statute is entirely silent as to when an agreement to try to obtain information obstructs a lawful government function, and when and whether such a scheme is deceitful or dishonest.  The Supreme Court previously has relied on the rule of lenity to prevent an atextual and overbroad interpretation of Section 371.  *See Tanner v. United States*, 483 U.S. 107, 131, 107 S. Ct. 2739, 2753 (1987) (holding that Section 371's defraud prong does not reach schemes to defraud recipients of federal financial assistance).  We respectfully submit that the Court should take the same tack here and preclude the government's attempt to use the *Klein* doctrine to prosecute a downstream tippee for receiving governmental information from an unknown source at an agency that regularly communicates with the public.

Finally, we respectfully submit that the rule of lenity requires limiting the application of Section 371 to schemes to obtain government money and property.  While we recognize the Second Circuit rejected this argument in *Coplan,* 703 F.3d at 61, we respectfully submit that, as with Section 641, the Supreme Court's recent jurisprudence warrants reconsideration of the propriety of the *Klein* conspiracy, which is wholly untethered from the text of Section 371, and we seek to preserve this issue in the event the Supreme Court revisits the viability of the *Klein* doctrine in the future.

## CONCLUSION

For all of the foregoing reasons, we respectfully request that the Court dismiss the Indictment against Mr. Huber. Mr. Huber also joins in (1) Mr. Olan's motions to dismiss Count Three of the Indictment, to require the government to review information in the possession of the SEC in order to comply with its disclosure obligations under *Brady v. Maryland* and its progeny, to order the government to provide a bill of particulars, and to sever Counts Seventeen and Eighteen of the Indictment; (2) Mr. Blaszczak's motions for discovery and other appropriate relief to address the government's violations of grand jury secrecy and to strike prejudicial surplusage in the Indictment; and (3) Mr. Worrall's motion for a bill of particulars.

Dated:  New York, New York
       October 27, 2017

Respectfully submitted,


By:   /s/                               

Barry H. Berke
Dani R. James

KRAMER LEVIN NAFTALIS
& FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10001
Telephone: 212.715.9100

*Counsel for Defendant Theodore Huber*